RECEIVED
U.S. COURT OF APPEALS
FOR THE D.C. CIRCUIT

2022 JUL 26  AM 12: 05

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

FILING DEPOSITORY

| | |
|---|---|
| ADRIENNE O. LEWIS )<br>8614 Indian Springs Road<br>Laurel, MD.  20724 )<br><br>    Plaintiff )<br><br>v. )<br><br>ROBERT N. KELLY, Esq. ).<br>Jackson & Campbell, P.C.<br>2300 N Street, N.W.   Suite 300 )<br>Washington, D.C.   20037<br>)<br>and<br>)<br>Jackson & Campbell, P.C.<br>2300 N Street, N.W.   Suite 300<br>Washington, D.C.   20037 | **Case: 1:22−cv−02202 JURY DEMAND**<br>**Assigned To : Unassigned**<br>**Assign. Date : 7/26/2022**<br>**Description: Pro Se Gen. Civ. (F−DECK)**<br><br>JURY TRIAL DEMANDED |

## COMPLAINT AND DEMAND FOR JURY TRIAL

COMES NOW Plaintiff Adrienne O. Lewis , Pro SE, who brings this action against

Defendants, Robert N. Kelly, Esq. and Jackson & Campbell, P.C., (collectively "Defendants")

for the loss she suffered as a result of the Defendants' legal malpractice, which arose from the

fraud or misrepresentation, and negligence of Defendants in representing that Defendants were

pursuing a claim on behalf of Plaintiff against Allstate Homeowners Insurance.

## JURISDICTION AND VENUE

1.  This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. s 1332. The

    amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

2. Venue is appropriate in this judicial district pursuant to 28 U.S.C. s1391 because all actions, and inactions, errors and omissions of Defendants, both negligent and intentional, which are the basis of Plaintiff's complaint, took place in the District of Columbia.

3. Plaintiff has suffered major financial harm, as well as significant health issues due to the legal malpractice of Defendants, including fraud and/or misrepresentation, and negligence in actions and inactions, errors and omissions.

## PARTIES

4. Plaintiff is an adult resident of Laurel, Maryland.

5. Defendant, Jackson & Campbell, P.C., is a professional corporation that is a law firm located at 2300 N Street, N.W., Suite 300, Washington, D.C.  20037, which regularly does business in the District of Columbia.

6. Defendant Robert N. Kelly, Esq. is an attorney practicing law in the District of Columbia with the firm Jackson & Campbell, P.C. and is believed to be a resident of Maryland.

7. The property which was the subject of Plaintiff's dispute with Allstate Homeowners Insurance is located in the District of Columbia.

## FACTUAL BACKGROUND

8. In mid-June 2018 Plaintiff and Defendant Kelly were attempting to set a date to meet for detailed discussions about Plaintiff's problems with Allstate Homeowners Insurance.  On June 21, 2018 Defendant Kelly stated that if he agreed to represent Plaintiff there would be a $5,000 retainer fee required, and if the claim was viable he

expected the costs to exceed $20,000.  Defendants had Plaintiff's documentation regarding Plaintiff's claim against Allstate Homeowners Insurance.

9. On or about July 26, 2018 Defendant Kelly forwarded a retainer agreement to Plaintiff.  Plaintiff had previously spoken to and met with Defendant Kelly, who stated that he had done a conflicts check prior to their meeting. Plaintiff and Defendant Kelly had discussed Plaintiff's claims regarding a greatly delayed and grossly inadequate claim payment by Allstate Homeowners Insurance for the District of Columbia property. During Plaintiff's first meetings with Defendant Kelly, Defendant was very reassuring to Plaintiff and stated that insurance companies in situations like Plaintiff's almost always settle claims rather than go to trial because insurance companies do not want to air claims denials and complaints about low payments before a jury.  Defendant Kelly informed Plaintiff that he generally did work involving commercial insurance companies like AIG. Defendant Kelly informed Plaintiff that she could also recover payments for storage of items which had to be removed from the property, diminution of value for the property which then would have a history of mold which would need to be disclosed to any subsequent buyer, loss of use, loss of rental income, loss of personal property, and payment for mileage due to frequently going to the property, etc.

10. Plaintiff was very relieved that Defendant Kelly was pursing her claim and stated that to family and friends immediately.  Plaintiff's claim problem with Allstate had been a long source of frustration and distress for Plaintiff and was well known to those close to Plaintiff.

11. On or about August 8, 2018 Plaintiff returned the signed agreement and made the initial payment of $5,000 to the Defendants. The agreement was signed by Defendant Kelly and stated that, "Although I (Defendant Kelly) do not at present anticipate the need for support from others in the Firm, to the extent that this is necessary the hourly rates for others are as follows …"  Various hourly rates of Defendant Kelly, directors and senior counsel, associates, and law clerks and paralegals were specified. The agreement stated that Defendant Kelly would be "…primarily responsible for the Firm's representation of Plaintiff."

12. Defendant Kelly had referred Plaintiff to a general contractor with whom Defendant Kelly stated he had previously worked. The contractor was to provide the cost to restore Plaintiff's property. Plaintiff met with the contractor on August 27, 2018.

13. In October 2018 Plaintiff and Defendant Kelly exchanged e-mails., as they had before. Defendant Kelly stated that he thought Plaintiff had attempted to reach him and he would follow-up. Defendant stated that he had lost his secretary suddenly.

14. On October 19, 2018 Plaintiff e-mailed Defendant Kelly that she, Plaintiff, had been referred to a remediation specialist by the general contractor to whom Defendant Kelly had referred Plaintiff. Defendant Kelly had been very clear that Plaintiff was to listen to the general contractor in terms of referrals for required work estimates.

15. On November 12, 2018 and November 16, 2018 Plaintiff e-mailed Defendant Kelly stating that she, Plaintiff, was having issues getting any response about remediation costs from the specialist to whom she was referred by the general contractor.

16. Plaintiff and Defendant Kelly communicated by e-mail in mid-December regarding air quality testing.

17. On December 12, 2018 Defendant Kelly e-mailed that he was aware that Plaintiff had been attempting to reach him but he had been unavailable.

18. In March 2019 Plaintiff sent Defendant Kelly an e-mail stating that she was having problems getting contractors to review the damage, as well as getting written quotes from those who did visit. Contractors who did visit asked Plaintiff if there had been an insurance claim and when told it was a problem with Allstate, the companies declined to provide a quote.

19. On April 19, 2019 Plaintiff e-mialed Defendant Kelly that she was still trying to get written quotes and asked Defendant to provided three more names as Defendant Kelly had previously stated that he would do.  Plaintiff also stated that her time was getting shorter to move the matter forward. Plaintiff did not want to wait until the deadline to file in court to have the matter advanced by Defendants.

20. On April 19, 2019, Defendant Kelly e-mailed and apologized that he had missed Plaintiff's calls and that he would be out of the office for most of the next week. Plaintiff reiterated by e-mail that the general contractor to whom Defendant Kelly had referred Plaintiff had not provided any writtten quote for work and the remediation specialist, who took weeks to respond and visit the property, had not provided anything written, and again was not responding to calls.  Defendant Kelly stated that the general contractor had given him a figure, but Plaintiff had never received any of that information.  Defendant Kelly provided the names of other companies which Plaintiff had requested previously. Those companies either did not respond or stated directly that they would not get involved in an insurance problem with Allstate.

21.  Plaintiff next attempted to reach Defendant Kelly by e-mail on April 19, 2019 at the end of the day but received no response. Plaintiff was unable to reach Defendant Kelly by any means, even after leaving messages with his assistant, on office voicemail, or his cell phone.  Plaintiff did receive return calls from Defendant Kelly's assistant in response to Plaintiff's many messages to Defendant Kelly.  Return calls were promised but were not received. There were no entries on Plaintiff's cellphone indicating that calls were made to her from Defendants.

22.  Plaintiff believed that the deadline to file a lawsuit against Allstate was approaching, which was the same date that Defendant Kelly had agreed was the deadline to file a lawsuit. On July 24, 2019 Plaintiff left voicemail messages on Defendant Kelly's direct office phone line, one on his cell phone, and also left a message with his assistant but again received no response. Plaintiff had used the same means of attempting to contact Defendant Kelly on other occasions and not received return calls from Defendants.

23. On July 25, 2019 given the number of calls which had gone unreturned and it being clear that Defendants had abandoned Plaintiff's case, Plaintiff documented the calls from the previous day in an e-mail and cited lack of responsiveness and requested return of her retainer. The e-mail reply, from Defendant Kelly came a mere four minutes later and stated that a check would go out immediately.

24. Plaintiff received an e-mail dated August 7, 2019 from Defendant Kelly's assistant stating that the check was being sent by Fedex on the same date.

25. On August 8, 2019 Plaintiff sent Defendant Kelly an e-mail requesting to speak to him and stating that Plaintiff was close to her deadline and needed assistance. Plaintiff thought that at least Defendants could provide a referral.

26. On August 9, 2019 at 6:52 a.m. Plaintiff sent an e-mail to Defendant Kelly reiterating that he was not returning phone calls and that Plaintiff had a looming deadline. Plaintiff requested to speak with Defendant.

27. At 8:56 a.m. Defendant Kelly responded by e-mail stating that he was out of the office until at least Friday and that Plaintiff had discharged him. Defendant stated that he had told Plaintiff "…all along that I (Defendant Kelly) would not represent you (Plaintiff) in a direct claim against an insurance carrier, as it presents a conflict of interest for me (Defendant Kelly).

28. In response to the e-mail from Defendant Kelly, at 11:51 a.m. Plaintiff responded that Defendant never told her he had a conflict of interest and that he would not sue a carrier because of a conflict of interest.  Plaintiff responded in writing that Defendant told her he had done a conflicts check before speaking with her in any detail and that Defendant had told Plaintiff he was involved with commercial carriers, like AIG. Plaintiff stated that had Defendant been honest and forthcoming there would have been no need for Plaintiff to speak with Defendants, and certainly not retain them. Defendant Kelly had never said he was <u>not</u> representing Plaintiff. While Plaintiff terminated the relationship in writing it was only after Defendants were not responding and clearly had **abandoned** Plaintiff's matter.  Plaintiff was deliberately mislead about the involvement of Defendants; Defendants alone drafted the Retainer Agreement and if the intention was what was being presented by Defendant Kelly at

this point, the Retainer Agreement had been worded to avoid the issue of conflict of interest.

29. Shortly after Plaintiff's e-mail at 11:51 a.m. on August 9, 2019 Plaintiff was able to finish the e-mail at 12:05 p.m. at which time Plaintiff stated that she was deliberately mislead by Defendants. Plaintiff stated that had Defendants had a conflict of interest, no one in the firm should have spoken to Plaintiff in detail, much less had an agreement to provide advice or represent her in any way. The result was that Plaintiff lost well over a year of time to identify another attorney to represent her in a claim against Allstate.

30. Plaintiff did her best to secure other legal representation before the filing deadline which was at the end of August 2019. While Plaintiff was able to secure assistance to file the matter by the deadline, she was unable to find an attorney to represent her in litigation and the case was dismissed without prejudice. The ability to retain counsel was rendered virtually impossible by the appearance and quick spread of Covid, which shut down even the courts except for extremely pressing matters.  Plaintiff contacted attorneys daily but many were not in their offices, were not returning calls at all, had conflicts, or did defense work only .

## CAUSE OF ACTION

## LEGAL MALPRACTICE

31. Plaintiff adopts by reference the allegations set for the in paragraphs 1 through 30 of this Complaint as if fully restated herein.

32. Plaintiff retained Defendants to secure full payment for restoration of the D.C.

property as required, as well all other compensation to which Plaintiff was entitled.

Defendant assured Plaintiff that such would most likely be accomplished in

settlement. However, at no time was there any discussion, comment, or written

documentation prior to Plaintiff entering into a Retainer Agreement with Defendants

which indicated that there was a conflict of interest. Such a conflict barred

Defendants from representing Plaintiff at all, or even in speaking to her in detail. At

no time did Defendants convey that there was a conflict of interest until Plaintiff

officially terminated the relationship due to the prior constructive abandonment of

Plaintiff's representation and interests by Defendants. The conflict of interest was

only revealed upon official termination by Plaintiff based upon the inaction and lack

of response over time by Defendants.  Defendants alone drafted the Retainer

Agreement and there was no indication that there was a conflict of interest on the part

of Defendants. Fraud is an intentional deception to secure unlawful or unfair gain, or

to deprive a victim of a legal right.  In this case Defendants knew of the conflict but

concealed it from Plaintiff who entered a Retainer Agreement with Defendants.  The

conflict of interest which was concealed from Plaintiff made it impossible for

Defendants to represent Plaintiff's interests at all, much less thoroughly and

diligently. Defendants did nothing to advance Plaintiff's legal interests and

deliberately concealed the conflict of interest which resulted in a benefit for Allstate

as Allstate would not be forced to pay Plaintiff's claim properly. At one point it was

determined that Allstate provided bonuses to adjusters who underpaid legitimate

claims. Plaintiff has considered the possibility that Defendants have benefitted in

some way by thwarting the filing of complaints against Allstate. The same intentional concealing of facts which prevented Plaintiff from receiving any representation by Defendants could also have benefitted Defendants had there been enough work that Plaintiff was responsible for payment to the Defendants.  In the case of fraud, an award of treble damages is possible. Given the egregiousness of the facts deliberately concealed by Defendants coupled with Defendants' inaction, misrepresentation instead would likely involve too low a standard because it does not require the depth of deception which was manifested by Defendants' conduct. Nevertheless, misrepresentation exists at a minimum.  The drafting of the Retainer Agreement is a deft deliberate concealment of material fact.

33. Defendants agreed to represent Plaintiff by entering into an agreement with Plaintiff and had a duty to use a degree of care reasonably expected of other legal professionals with similar skills acting under the same or similar circumstances. The duties included, but were not limited to, provide competent representation and diligence. Defendants did nothing to advance a possible settlement as Defendant Kelly had stated was likely, much less prepare for the filing of a complaint. Because no efforts to prepare for a possible settlement were made, filing a complaint in a timely manner would have been required. In this regard the standard of care and duties owed to Plaintiff were not provided at all.

34. Defendants failed to assist Plaintiff and were not responsive to Plaintiff's requests for return phone calls, and promised referrals to assess the property, much less any representation of any type.

35.  By concealing information prohibiting Defendants from assisting Plaintiff, Defendants have caused Plaintiff financial harm which Defendants did nothing to mitigate. Mitigation may have been possible by providing some attorney referrals to Plaintiff, but Defendants did nothing.

36. Defendant did nothing to properly represent Plaintiff's interests.

37. As a direct result of Defendants' act of concealing facts which prevented Defendants from properly and diligently representing Plaintiff's interests at all against Allstate Homeowners Insurance, Plaintiff incurred additional and substantial financial harm in addition to that which Plaintiff had already been subjected by Allstate Homeowners Insurance.

38. Defendants had an undisclosed conflict of interest which clearly favored one client over another. The client harmed was Plaintiff as her interests were not represented at all by Defendants.  The time during which Plaintiff believed she was represented by Defendants when that was impossible due to a conflict of interest, would have been better used in securing other counsel. Had Plaintiff not addressed the abandonment of her case and officially terminated the relationship with Defendants, Defendants may not even have raised the conflict of interest, but certainly could not have filed a complaint on behalf of Plaintiff.  To the extent that she could, Plaintiff attempted to decrease any damages. Other attorneys and firms were honest immediately if they had conflicts. It appears that there are many fewer Plaintiff's attorneys for homeowners' insurance claims, none of the many other attorneys whom Plaintiff contacted failed to immediately express that they only do insurance defense work.

39. Defendants' firm had a duty to supervise and determine if cases were appropriate for the firm considering their work and former and current clients. It appears that Jackson & Campbell was not thoroughly and properly reviewing for conflicts of interest. If a conflict was detected, it was imperative to inform parties and make the best possible arrangements to attempt to ensure that no client was harmed as a result of a conflict. No effort was made to assist Plaintiff in securing other representation and no notice was given to Plaintiff of the conflict until Defendants had clearly abandoned Plaintiff's representation through inaction and lack of responsiveness.

40. Plaintiff's underlying claim against Allstate could have been won or settled by competent counsel. Allstate delayed coming to the property for almost one month after a claim was reported, and cancelled earlier appointments. The claim resulted from water damage after a major storm which resulted in trees falling on houses and cars. The claim was not denied but the payments were only a tiny fraction of the amount needed to repair the home. Having never had a homeowners' insurance claim previously, Plaintiff believed the repeated lies of the insurance company that it was going to fully pay the claim. Plaintiff preserved over 120 text messages which prove the deceptive practices which Allstate used. Plaintiff escalated concerns to management and while promises were made, they were never kept. Allstate issued checks in the wrong names and took months to replace them. Itemizations were not provided even when requested. Plaintiff has more than sufficient documentation to prove her case. Allstate has paid only a tiny percentage of what is required to repair the home and it will be far more expensive now than it would have been at the time of the storm. Defendant Kelly reviewed the documentation and assured Plaintiff the

claim would be settled. Allstate even paid for an air quality test when Servicemaster

stated that it could not undertake remediation without air quality testing before

beginning work. The air quality test results were so bad that the adjuster greatly

delayed providing the results to Plaintiff.

WHEREFORE, Plaintiff respectfully demands judgment against Defendants in an

amount equal to what Allstate Homeowners Insurance would have been required to

pay Plaintiff, had Plaintiff's case been diligently pursued by Defendants, and that

such amount be tripled as allowed in the case of fraud, plus pre and post judgment

interest, costs, and reasonable attorneys' fees, and such and other further relief as this

Honorable Court deems fair and just.

Respectfully submitted,

Adrienne Lewis (Pro Se)
8614 Indian Springs Rd.
Laurel, MD.  20724
(301) 922-7233
adrlew1011@gmail.com

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial in this matter.

Adrienne Lewis

Dated: 7/25/22

Plaintiff had to wait for
guard to come to door
and allow me to enter after
I spoke through the intercom